MUTUAL TRUST LIFE INSURANCE COMPANY, Appellant, v. FOREST DEAN et al., Appellees.

No. 43216.

APRIL 7, 1936.

Otto L. Schluter, for appellant.

H. E. Narey, for appellees Forest and Caroline Dean.

HAMILTON, J.—It is the contention of appellants that this case falls within the rule announced by the majority opinions in the cases of Federal Land Bank v. Wilmarth, 218 Iowa 339, 252 N. W. 507, 94 A. L. R. 1338, and Reed v. Snow, 218 Iowa 1165, 254 N. W. 800. We have carefully read and considered the record, and while in some respects the fact situations in this case and in the above cases are similar, they are in no sense parallel.

The defendants are husband and wife, about thirty years of age, at the very threshold of maturity of judgment and discretion, capable, if ever, to face the world with courage and fortitude. There is no evidence that these young people are shiftless, improvident, or dishonest. Like multitudes of others, ap-

parently they builded too well and incurred indebtedness in so doing, that, in the years of low prices which followed, left them with shortened purse strings, with no corresponding contraction of obligations. The gift of prophetic vision, it seems, was withheld from these lowly swains of the soil, and the alluring mirage of perpetual prosperity led them deep into the uncharted desert of unprecedented depression. But they were not alone in their illusion. The plaintiff insurance company was likewise dazzled by the brightness of prospects, for in March, 1928, it loaned the defendants, on their 240-acre farm, $100 per acre, or $24,000. This was long after the era of boom prices in real estate. Granting the plaintiff the status of the ordinary conservative corporate loan agency, loaning up to 60 per cent of the appraised value of the land, we conclude this farm was valued by plaintiff in 1928 at $40,000. The evidence as to value at the time of the hearing on this motion for continuance (April, 1935) varied from $80 to $125 per acre, one witness stating that in normal times the value would be $150. The plaintiff's witnesses in describing the farm used such terms as "worth $100.00 an acre easy," "farm in high state of cultivation," "one of the best farms in Ocheyedan territory," "improvements good," "soil is good black loam." Defendants' witnesses placed the value at $125. One of them said the farm in his judgment would bring $115 at auction. That the farm is highly productive is shown by the testimony of plaintiff's witness Brunk, who for the past seven years had farmed the same as a tenant of the defendants. He said: "I paid the 1931 and 1932 crop rent to Forest Dean. In 1931 I paid $1800 rent to Forest Dean. In 1932 I turned over to Forest Dean 5600 bushels of corn and 1600 bushels of barley and $300.00 in cash. The farm is improved with a chicken house, corn crib, granary, two story house, two barns. Buildings better than average. Farm all open to cultivation. Fences are fair. Many posts are broken. Cedar posts and 36 inch woven wire fenced in 40-acre pieces with lanes. Electricity served from highline along south end of farm adjacent to Primary Road No. 9. Buildings located 80 rods from highway. I farmed that land myself and it is in good condition. Soil is good black loam. The farm is located one mile north of the town of Ocheyedan. There is no normal market on farms in this vicinity. I would say that the Dean farm is worth $100.00 an acre easy, but I don't know if it is worth more than that."

The total mortgage indebtedness after deducting rent for 1934 and 1935 figured to February, 1936, is $27,187.20. This added to other indebtedness of the defendants brings the total indebtedness to the sum of $30,979.20 It appears from the evidence that in 1932 the defendant, being unable to make ends meet in farming, rented the farm and built an oil station on one corner of the same, out on Primary Highway No. 9, and attempted to make some money in selling gas and oil. In order to do this, he borrowed the money and assigned as security the crops for 1932 and 1933. He procured the consent of the plaintiff to release the mortgage on the two acres of land upon which the filling station was located by paying them $750, which was applied upon the mortgage indebtedness. He has since sold the filling station, and the purchaser, one Mr. Skinner, owes the defendants on the purchase price the sum of $2,000. This $2,000 due him, added to the value of the farm as fairly estimated from the evidence, leaves the items of debit and credit almost on a par. So it cannot be said that the defendants are hopelessly insolvent, and that there is no possibility of the defendants' refinancing or disposing of the farm for sufficient to liquidate the indebtedness within the period of the moratorium statute, as was the finding in the Wilmarth and Snow cases, above referred to.

There are some circumstances which would indicate that back in 1932 the defendants were preparing to leave, and did abandon all hope of holding the farm. This is evidenced by the fact that the defendants moved off the farm and rented the same and went into other business, and at the same time dismantled the electric equipment, moving some of the light fixtures in the house and taking out the push buttons and plates, and likewise removing the pipeless furnace, and also tearing down a board fence and removing some of the mangers and stalls from one of the barns and a few rods of woven wire fence. Defendant by way of explanation of this conduct stated: "I had to quit farming because I was not able to carry on financially. I rented the farm to Mr. Brunk and I went into the hatchery business and used the farm buildings on the Dean farm for that purpose. Later, I built an oil station on the corner of this farm and ran it for a while. I took the furnace out of the farm home and put it in the gas station. The furnace had not worked for a year— was not worth fixing up, has not worked in the gas station where I took it. I assigned one half of my 1932 crop lease to my

brother, Wilber Dean, to secure him on money he lent me to build a gas station. I paid for this gas station out of the 1932 and 1933 crops. The stalls and mangers were taken out of the barn the first year I moved there, 8 or 10 years ago, before plaintiff's mortgage. I put heavy wires to carry 220 volts but wind and sleet broke down the wires between the buildings. I had not used lights for a year. Couldn't afford it. I moved it off figuring the renter might not take care of it. There were three fixtures in the house which cost $1.50 a piece and upstairs were drop cords. Buildings were all wired. I just disconnected them. I took the high board fence, part of which had fallen down, cut it into boards, and made brooder houses. Posts were rotten.''

It appears from the evidence that the defendant had figured for some time on getting help from his mother, who owns a one-fourth interest in a farm near Cedar Falls, and likewise has an interest in a claim against an oil company now in litigation in the United States Supreme Court, being a one-fourth interest in a one-half million dollar claim, and that his mother had told him that if she received this money she would pay off the mortgage. He further testified that two or three years ago he offered to give plaintiff the rents if they would not foreclose, and that he sent them the 1934 lease on what he thought was such an agreement. After receiving this lease, the plaintiff, on October 13, 1933, filed their petition to foreclose the mortgage. It appears that no resistance was made by the defendants to the appointment of a receiver, and that a receiver was appointed and has had charge of renting the farm ever since, and the same receiver was appointed by the court to continue to rent the farm during the moratorium period. There are two small judgments against the defendants, one in the sum of $27.43, and the other of $68.75. The plaintiff paid the taxes for the year 1931 and also paid $233.35 on 1932 taxes. Likewise, plaintiff paid two items of premium on insurance.

On the question of waste complained of, it can be said that while the defendants were probably justified under the circumstances in disconnecting the electric wiring and removing the same to prevent its destruction, they were not justified in removing the light fixtures and push button plates, which left holes in the wall. However, the value of these fixtures, and the slight cost of repairing the injury done, would not justify the

court, for this reason, in refusing the continuance. The boards that were taken from the fence and used in the construction of brooder houses which defendant used in his hatchery business was certainly a good-faith use, it appearing from the evidence that the posts were rotted. It must be kept in mind that at that time it was a difficult matter to obtain money, and farmers were forced to resort to just such means to get along at all. The amount of woven wire removed consisted of seven rods, and the evidence does not show that the removal of either the board fence or the woven wire in any way affected the value of the plaintiff's security.

In the light of the defendant's explanation of the circumstances which plaintiff relies upon as showing bad faith and abandonment of the farm, the court is left in doubt on this phase of the matter. No doubt the defendants were during those depressing years greatly discouraged and disheartened at the seemingly insurmountable difficulties with which they, with multitudes of others, were faced. It was just this situation which called forth the moratorium statutes. It was not, however, a confession or admission of defeat that the defendants should quit the farming business and place the farm in the hands of a tenant who, it is shown, is a very good farmer, and attempt by outside employment to make a living without resorting to the use of the rents. That this did not turn out more favorably is not an evidence of bad faith or an act for which the defendant should stand condemned. If anything, it evidences a determination which is commendable. While the margin of defendants' equity in this farm above the mortgage indebtedness is small and their prospects in the future of being able to refinance the same are not bright, the fact that there is some prospect of financial assistance from the mother and likewise under the evidence a probability that this farm under improved conditions may be sold for more than the amount of the mortgage indebtedness, coupled with the further fact that the record shows that the plaintiff is receiving the benefit of the full rental value of the farm and has received the same for the past two years, we are not inclined to disturb the lower court's ruling.

It must be borne in mind that under the plain wording of the statute, and the rule established by our prior decisions, the defendants, as a matter of law and equity, are entitled to a continuance unless good cause is shown to the contrary, and this

burden is upon the plaintiff. This mortgage was placed upon this farm in 1928. Since that time the defendants have reduced the principal $1,000, paid the 1928, 1929, and 1930 taxes. They have paid upon a second mortgage the sum of $1,200. They have paid interest of approximately $6,000. They voluntarily assigned to plaintiff the rent for 1934, and while the plaintiff did not get the rent for 1932 and 1933, it was applied upon indebtedness incurred in building a filling station, and the plaintiff voluntarily released the mortgage on the land upon which the filling station was situated for a consideration of $750, and this money was turned over to the plaintiff. It further appears that the defendant received some life insurance upon the life of his father who died in 1931, and this was applied on the 1932 interest installment.

On the whole record, we cannot say that there was any abuse of discretion, and the case must stand affirmed.—Affirmed.

DONEGAN, C. J., and all Justices concur.